| | |
|---|---|
| STATE OF MAINE | SUPERIOR COURT |
| CUMBERLAND, ss. | DOCKET NO. CV- |

RICHARD AUSTIN,

    Plaintiff,

v.

MAINELY CONSTRUCTION RENTALS, LLC and COASTAL MASONRY & CONTRACTING, INC.,

    Defendants.

**COMPLAINT**
**INJUNCTIVE RELIEF SOUGHT**

    NOW COMES Plaintiff Richard Austin ("Plaintiff" or "Mr. Austin"), by and through counsel, and complains against Defendants Mainely Construction Rentals, LLC ("MCR") and Coastal Masonry & Contracting, Inc. ("CMC") (together, "Defendants"), as follows:

### JURISDICTION AND PARTIES

    1.    This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551, *et seq.* and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*

    2.    Mr. Austin is a United States citizen residing in the Town of Waldoboro, County of Lincoln, State of Maine.

    3.    MCR is a Maine limited liability corporation with a principal place of business in the Town of Freeport, County of Cumberland, State of Maine.

    4.    CMC is a Maine business corporation with a principal place of business in the Town of Georgetown, County of Sagadahoc, State of Maine.

    5.    At all material times, Defendants were Mr. Austin's "employer" as that term is defined in the MHRA and the ADA.

6. Mr. Austin filed a timely Charge/Complaint of Discrimination with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC").

7. On March 25, 2020, Mr. Austin received a "right to sue" letter from the MHRC.

8. On March 26, 2020, Mr. Austin received a "right to sue" letter from the EEOC.

9. Mr. Austin has exhausted all administrative remedies for purposes of the claims set forth in this Complaint.

## STATEMENT OF FACTS

10. On February 5, 2019, Defendants terminated Mr. Austin's employment due to disability discrimination in violation of the MHRA.

11. CMC is a masonry and concrete subcontractor for commercial construction projects.

12. MCR rents working platforms for construction and renovation projects.

13. John Martin works as the Operations Manager for MCR.

14. At all relevant times, CMC and MCR operated as Mr. Austin's joint employer.

15. At all relevant times, CMC and MCR operated as an integrated enterprise.

16. Defendants have common ownership and management; they exercise centralized control of labor relations; and their operations are interrelated.

17. Mr. Austin is a person with a physical disability as defined by the MHRA and ADA.

18. In 2017, Mr. Austin was diagnosed with right ventricular outflow tachycardia, a heart condition that causes him to feel light-headed or dizzy, flushed, short of breath, and then he

2

loses consciousness. Mr. Austin was prescribed and takes medication (Verapamil) to treat his condition.

19. Heart disease is a *per se* disability under the MHRA. 5 M.R.S. § 4553-A(1)(B).

20. In its untreated condition, Mr. Austin's heart disease is a physical impairment that substantially limits, inter alia, the major life activities of consciousness, breathing, and the functioning of his cardiovascular system.

21. An impairment that is episodic or in remission is a disability if the impairment substantially limits a major life activity when it is active. That is the case for Mr. Austin. When Mr. Austin is not having an episode of tachycardia, his breathing and consciousness is normal. When Mr. Austin is having an episode of tachycardia, he feels light-headed or dizzy, flushed, short of breath, and then he loses consciousness.

22. Mr. Austin's impairment has lasted more than six months.

23. Mr. Austin's heart disease impairs his health to a significant extent as compared to what is ordinarily experienced in the general population.

24. Defendants regarded Mr. Austin as a person with a disability during and after Mr. Austin had an episode of tachycardia at work.

25. Mr. Austin is a qualified individual with a disability in that he can perform the essential functions of the job he held with Defendants, with or without reasonable accommodations.

26. Mr. Austin started working for Defendants on December 17, 2018.

27. According to Defendants, Mr. Austin was hired by CMC to work for MCR on a construction project at the Maine Medical Center ("MMC") in Portland ("East Tower Project").

28. Turner Construction Co. was the contractor.

29. MCR was a subcontractor.

30. Mr. Austin did not have a job title or job description.

31. Mr. Austin was paid $15 per hour and worked a full time, 40 hours per week schedule.

32. When he was hired, Mr. Austin was told that after two weeks, he would be reviewed and considered for a raise.

33. One day in January 2019, Mr. Austin called out sick with the flu.

34. John Martin called Mr. Austin at home and told Mr. Austin that he was shorthanded and could use some help.

35. Mr. Austin immediately reported for work and even stayed late that day.

36. After Mr. Austin was employed for about four or five weeks, he was told that John Martin, in consultation with Rebecca Lizotte, had decided to raise Mr. Austin's pay from $15 to $17.50 per hour in 30 days and possibly another $2.50 per hour raise 30 days after that if everything went well.

37. Mr. Austin worked with scaffolding during his first two days of employment when he helped take down (not install) some scaffolding.

38. After that, Mr. Austin started training with Samuel Gath to operate the hydro elevator.

39. Mr. Austin was told that he would be operating the elevator on weekends and other times when Mr. Gath wasn't available.

40. Mr. Austin operated the elevator every day for the next five weeks and frequently after that when needed.

41. When Mr. Austin was not operating the hydro elevator, he worked in the elevator shafts.

42. Mr. Austin spent about one week helping to build an enclosure for the concrete prep for helicopter pads on top of the building.

43. On Thursday, January 31, 2019, Mr. Austin passed out while riding in the hydro-mobile elevator as he was heading up for morning briefing before working on the elevators.

44. Mr. Austin was taken to the MMC Emergency Department for treatment.

45. John Martin met with Mr. Austin while he was in the hospital for treatment to go over an Incident Report.

46. On Friday, February 1, 2019, Mr. Austin's cardiologist implanted a loop recorder under the skin of his chest.

47. The loop recorder is a small device, about the size of a memory stick, which records the electrical signals in Mr. Austin's heart.

48. When the recording is downloaded, Mr. Austin's doctor can see how his heart has been working.

49. Mr. Austin recovered swiftly from the minor procedure and was discharged from the hospital later that day.

50. After Mr. Austin was discharged as a patient, he went to speak with John Martin at the Connex office (MCR's mobile on-site office).

51. Mr. Austin went into the office, met with John Martin, told Mr. Martin he was discharged from the hospital with a loop recorder, and told Mr. Martin that he wanted to return to work on Monday.

52. John Martin told Mr. Austin that he would need to bring in a doctor's note saying that his condition was stabilized and he was released for work.

53. Mr. Austin told Mr. Martin that he would schedule an appointment with his doctor right away, hopefully by Monday.

54. Mr. Austin saw his doctor on Monday, February 4, 2019, in about mid-afternoon, and was cleared to return to work. The doctor provided Mr. Austin with a note that read:

> "Richard Austin was seen in my office on 2/4/19. He may return to work on today, Feb 4, 2019. ¶ If you have any questions or concerns, please don't hesitate to call."

55. After Mr. Austin's doctor's appointment, it was too late in the day to report to work.

56. On Tuesday, February 5, 2019, Mr. Austin returned to work in full gear, steel toe boots, safety vest, and I.D., prepared to return to full duties.

57. Mr. Austin took with him the doctor's note that John Martin had requested.

58. Jan Martin was in the Connex office when Mr. Austin arrived at work.

59. When Mr. Austin entered the Connex office, Jan Martin asked Mr. Austin how it was going.

60. Mr. Austin told Jan Martin that he was well and ready to work.

61. Jan Martin asked Mr. Austin if he had clearance from a doctor.

62. Mr. Austin told him yes, and presented the note his doctor had written, clearing him to return to work. Jan Martin and John Martin were both right there when Mr. Austin handed Jan Martin the note.

63. At that point, Jan Martin asked Mr. Austin to step into an inner office and spoke to Mr. Austin in private.

6

64. Jan Martin explained to Mr. Austin that even though he had a doctor's note, they could not take a chance on him getting hurt by letting him back on the job.

65. Mr. Austin told Mr. Martin that he was cleared and healthy.

66. Jan Martin asked if Mr. Austin or his doctor could guarantee that it wouldn't happen again.

67. Mr. Austin told Jan Martin that it was impossible for anyone to make such a statement because you never know what is going to happen.

68. Mr. Austin said that his condition was being treated and his doctor had released him to return to work.

69. Jan Martin explained that it was a tough situation but he had no work that Mr. Austin could perform on the ground and did not feel comfortable keeping him on the crew.

70. Jan Martin said, "I don't want to have to call your wife and tell her you fell off a building."

71. Mr. Austin tried to convince Jan Martin to let him continue working. He said that he loved his job and intended on staying long term.

72. Jan Martin remained firm that Mr. Austin's employment was over.

73. Mr. Austin said he was disappointed by that decision.

74. After failing to convince Jan Martin to allow him to return to work, Mr. Austin asked if he could at least go to the 6th, 7th and 8th floors to thank several people who helped him the morning of the incident and to say goodbye to a few of the guys he had become close to while working there.

75. Mr. Austin did not ask that anyone accompany him.

76. Jan Martin opened the office door and asked John Martin to escort Mr. Austin to the work site to thank people.

77. On the 7th floor break room, Mr. Austin found the people who helped him and shook their hands. They asked how he was doing. Mr. Austin explained to them that he had been let go because, he was told, he was "a liability."

78. After that, Mr. Austin and John Martin returned to the office.

79. Jan Martin and John Martin asked Mr. Austin to turn in his work gear and then they asked him to leave.

80. Mr. Austin complied with their requests.

81. Defendants claim that on Tuesday, February 5, 2019, when Mr. Austin returned to the job site, he did not say he was there to return to work. That is not true. Mr. Austin returned to work on February 5, 2019, in full gear, steel toe boots, safety vest, and I.D., prepared to return to full duties.

82. Defendants claim that Mr. Austin was there to thank everyone who had assisted him on January 31, 2019 and that he did not seek to return to work. That is not true.

83. Contrary to Defendants' claims, Mr. Austin did not tell anyone that his heart medication had become ineffective.

84. What Mr. Austin told Defendants and their employees is that the doctors were trying to determine exactly what was going on with his heart, which is why the loop monitor was installed. Mr. Austin was still on the same medication and dose that he was originally prescribed in September 2017.

85. Contrary to Defendants' claims, Mr. Austin's wife did not tell anyone that Mr. Austin's medication was no longer effective. What she said on Facebook is that Mr. Austin had

8

been on medication and "we thought it was working fine." She did not say, "the medication is no longer working." She wrote that a loop monitor was implanted in his chest, that he could be monitored all the time, and it would help them determine what exactly caused him to pass out.

86. Contrary to Defendants' claims, Mr. Austin did not say or do anything to give Jan Martin or John Martin the impression that he or his doctor did not think he could safely resume his job duties.

87. Mr. Austin provided Defendants with a note from his doctor releasing him for work.

88. Contrary to Defendants' claims, Mr. Austin did not tell Jan Martin or anyone else that he would never be able to get clearance to return to work at the job site from his cardiologist or that he did not want to be "up there" (meaning, work on the upper floors). These statements are not consistent with Mr. Austin's actions (ready to work in full gear, with doctor's note clearing him to work in hand).

89. Defendants claim, without proof, that it was unsafe for Mr. Austin to perform the job duties for which he was hired.

90. The burden of proof that it was unsafe for Mr. Austin to work is on Defendants and they have not and will not be able to meet their burden.

91. When Mr. Austin did scaffolding and carpentry work, he worked on a solid surface and would simply fall to the ground if he fainted.

92. Mr. Austin wore a hard hat which protected him from head injury.

93. When Mr. Austin worked on top of the roof, he (like the rest of the crew) wore a safety harness that would stop him from falling to the ground.

94. Mr. Austin did not pose a risk of injury that was different or greater than other employees.

95. When Mr. Austin was operating the elevator, he stood on a platform and pressed buttons that made the cage go up and down the elevator. Two buttons need to be pushed and turned. If the operator's finger slips off, the elevator shuts down. The elevator does not operate unless someone is pressing the button.

96. If Mr. Austin fainted while operating the elevator, he would fall to the floor (wearing a hard hat) and the cage would stop.

97. Defendants do not have a factual basis to conclude that, to a reasonable probability, Mr. Austin was unable to perform his job duties, or perform them safely, because of his disability.

98. The mere possibility that Mr. Austin would faint again at work does not meet the legal standard.

99. Mr. Austin did not suffer any injury as a result of fainting at work on January 31, 2019.

100. Mr. Austin's doctor, who was best qualified to judge his medical condition, said that it was safe for Mr. Austin to continue working for Defendants.

101. Defendants violated Mr. Austin's rights under the MHRA and the ADA by firing him due to disability discrimination.

102. Mr. Austin has no plain, adequate, or complete remedy at law to fully redress the wrongs alleged, and he will continue to suffer irreparable injury from his treatment by Defendants unless and until Defendant is enjoined by this court.

## COUNT I: MHRA

103. Paragraphs 1-102 are incorporated by reference.

104. Defendants' conduct constitutes unlawful disability discrimination against Plaintiff in violation of the MHRA.

## COUNT II: ADA

105. Paragraphs 1-104 are incorporated by reference.

106. Defendants' conduct constitutes unlawful discrimination against Plaintiff in violation of the ADA.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court grant the following relief:

A. Enter Judgment in Plaintiff's favor;

B. Declare Defendants' conduct to be in violation of Plaintiff's rights under the MHRA and ADA;

C. Enjoin Defendants, their agents, successors, employees, and those acting in concert with them from continuing to violate Plaintiff's rights;

D. Order Defendants to employ Plaintiff or alternatively award front pay and benefits;

E. Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendants' discrimination;

F. Award equitable-relief for back pay, benefits and prejudgment interest;

G. Award compensatory damages in an amount to be determined at trial;

H. Award punitive damages in an amount to be determined at trial;

I. Award nominal damages;

J. Award attorney's fees, including legal expenses, and costs;

K. Award prejudgment interest;

L. Permanently enjoin Defendants from engaging in any employment practice which discriminates against employees on the basis of disability;

M. Require that Jan Martin and John Martin mail a letter to all employees notifying them of the verdict against it and stating that Defendants will not tolerate disability discrimination in the future;

N. Require that Defendants post a notice at all of their work sites of the verdict and a copy of the Court's order for injunctive relief;

O. Require that Defendants train all management level employees about the illegality of disability discrimination;

P. Require that Defendants place a document in Plaintiff's personnel file which explains that they unlawfully terminated Plaintiff because of disability discrimination; and

Q. Grant to Plaintiff such other and further relief as may be just and proper.


Dated at Portland, Maine this 10th day of April, 2020

Chad Hansen, Esq., Maine Bar No. 9489

Attorney for Plaintiff
EMPLOYEE RIGHTS GROUP
92 Exchange Street, 2nd floor
Portland, Maine 04101
Tel (207) 874-0905
Fax (207) 874-0343
chad@employeerightslaw.attorney